FILED
U. S. DISTRICT COURT
DISTRICT OF NEBRASKA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

2023 AUG 18  AM 11: 23

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>VINCENT J. PALERMO,<br><br>Defendant. | 4:23CR3052<br><br>PLEA AGREEMENT |

IT IS HEREBY AGREED between the plaintiff, United States of America, through its counsel, Susan T. Lehr, Acting United States Attorney, and Lesley A. Woods, Assistant United States Attorney, and defendant, VINCENT J. PALERMO, and Randall Paragas, counsel for defendant, as follows:

# I

## THE PLEA

A.   CHARGE(S) & FORFEITURE ALLEGATION(S).

Defendant agrees to plead guilty to Count I of the Indictment in 4:23CR3052. Count I charges a violation of Title 18, United States Code, Section 1349, conspiracy to commit wire fraud by deprivation of honest services.

B.   In exchange for the defendant's plea of guilty as indicated above, the United States agrees as follows:

1.   The United States will move to dismiss the remaining counts at time of sentencing.

2.   The United States agrees that the defendant will not be federally prosecuted in the District of Nebraska for crimes and offenses disclosed in the discovery material, other than as set forth in paragraph A, above. This agreement not to prosecute the defendant for specific crimes does not prevent any prosecuting authority from prosecuting the defendant for any other crime, or for any crime involving physical injury or death.

# II

## NATURE OF THE OFFENSE

1

A.    ELEMENTS EXPLAINED.

Defendant understands that the offense to which defendant is pleading guilty has the following elements:

1. Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit honest services fraud by wire as charged in Count I; and

2. The defendant knew the unlawful purpose of the plan and willfully joined in it.

B.    ELEMENTS UNDERSTOOD AND ADMITTED - FACTUAL BASIS.

Defendant has fully discussed the facts of this case with defense counsel. Defendant has committed each of the elements of the crime and admits that there is a factual basis for this guilty plea. The following facts are true and undisputed.

1. At times material to Count I, defendant VINCENT J. PALERMO, a/k/a "Vinny," was a city councilman and elected public official for the City of Omaha, as well as a member of the Turn Back Tax Committee that awards funds to non-profits, including the Latino Peace Officers Association ("LPOA"). VINCENT J. PALERMO also participated at times material to Count I in securing city funding for Police Athletics for Community Engagement (hereinafter "PACE") and in the process of awarding fireworks permits to nonprofits in the City of Omaha.

2. Between on or about January 1, 2018, and April 1, 2023, in the District of Nebraska and elsewhere, VINCENT J. PALERMO, defendant herein, did knowingly combine, conspire, confederate, and agree with co-defendants Johnny Palermo and Richard Gonzalez, to commit honest services fraud, to wit, they agreed to knowingly devise a scheme and artifice to defraud the residents of the City of Omaha of their intangible right to the honest services of City Councilman VINCENT J. PALERMO, and by interstate wires and means of facilities of interstate commerce, in violation of Title 18, United States Code, Section 1346 and Section 1343. Specifically, Richard Gonzalez and Johnny Palermo provided personal and financial benefits, to include airfare, luxury hotel accommodations, travel arrangements, and other items of value, through a stream of benefits, to City Councilman VINCENT J. PALERMO, in exchange for official actions and with the intent to influence official actions taken by City Councilman VINCENT J. PALERMO, for the benefit of LPOA, PACE, and themselves.

2

3. It was part of the conspiracy to defraud that VINCENT J. PALERMO failed to disclose that LPOA donations and grant money were used to purchase VINCENT J. PALERMO's travel, to include airfare and hotel rooms, as required to be disclosed under state law on VINCENT J. PALERMO's Statements of Financial Interests filed with the Nebraska Accountability and Disclosure Commission.

4. It was part of the conspiracy and scheme to defraud that VINCENT J. PALERMO failed to disclose his conflict of interest with LPOA when VINCENT J. PALERMO heard LPOA's applications for funds awarded by the South Omaha Turn Back Tax Committee and participated in decisions to award city funds to LPOA during material times for Count I. In total, the defendant participated in awarding $60,600 to LPOA through the South Omaha Turn Back Tax Committee.

5. It was part of the conspiracy and scheme to defraud that Councilman VINCENT J. PALERMO would select non-profits to receive fireworks permits at times material to COUNT I, and that VINCENT J. PALERMO selected LPOA and PACE each year material to Count I of the Indictment and that his consistent selections of LPOA and PACE for permits allowed Richard Gonzalez to negotiate greater sums of money from local fireworks vendors for the benefit of LPOA and PACE over other nonprofits in the City of Omaha who were not favored by VINCENT J. PALERMO.

6. It was part of the conspiracy and scheme to defraud that Richard Gonzalez used LPOA funds and PACE funds to fund travel for Councilman VINCENT J. PALERMO, to include a trip to Las Vegas in spring of 2019 with Richard Gonzalez, Johnny Palermo, and others known to the grand jury. The LPOA board did not approve funding this trip.

7. It was part of the conspiracy and scheme to defraud that the defendants worked together to conceal VINCENT J. PALERMO's name on certain hotel rooms paid for by LPOA for the defendant's benefit, to include a Marriott hotel room used by VINCENT J. PALERMO on a trip to San Diego in September, 2022 and a concierge suite for VINCENT J. PALERMO booked at a Houston Marriott location in 2021.

3

8. As part of the conspiracy and scheme to defraud described above and in furtherance of it, the defendants caused to be transmitted by means of wire communications, communications in interstate commerce and utilizing facilities of interstate commerce, the sounds and signals described below:

| Wire | On or About | Wire Description |
|------|-------------|------------------|
| LPOA debit card charge | 9/6/18 | LPOA debit card charged for VINCENT J. PALERMO's hotel room costs in Denver, Colorado for a stay from September 6, 2018, to September 8, 2018. |
| LPOA debit card charge | 9/6/18 to 9/8/18 | The LPOA debit card was billed for additional charges to VINCENT J. PALERMO's hotel room in Denver for charges at the Omni Hotel Pool Bar and Grille. |
| LPOA deposits City of Omaha Check from Turn Back Tax Committee | 2/28/19 | LPOA deposited a $19,000 check following VINCENT J. PALERMO's participation in their Turn Back Tax Committee decision to act on LPOA's application for funds. |
| RICHARD GONZALEZ and JOHNNY PALERMO used LPOA card to purchase flights to Las Vegas, Nevada | 3/21/19 | RICHARD GONZALEZ put together a trip to Las Vegas, Nevada for his friends and family and the councilman, VINCENT J. PALERMO, and worked with JOHNNY PALERMO to charge airfare for the trip for the defendant and others to the LPOA account.  VINCENT J. PALERMO's Allegiant Air ticket cost LPOA $397.  Total airfare for the group was $3012. Turn Back Tax Committee funds were used for this Las Vegas trip. |
| LPOA card was used to secure hotel rooms for the trip to Las Vegas, Nevada | 3/29/19 to 4/1/19 | LPOA funds were used to pay for the hotel rooms for the group that traveled to Las Vegas, including the defendant, VINCENT J. PALERMO. |
| LPOA deposited City of Omaha Check from Turn Back Tax Committee | 01/22/20 | LPOA deposited $19,000 check following VINCENT J. PALERMO's participation in their Turn Back Tax Committee decision to act on LPOA's application for funds. |

4

|  |  |  |
|---|---|---|
| LPOA debit card was used to purchase airfare to Houston, Texas | 9/6/21 | LPOA card was used to purchase an airline ticket for the defendant, VINCENT J. PALERMO to travel to Houston, Texas from September 8, 2021, to September 10, 2021, via United Airlines. RICHARD GONZALEZ and a PACE employee known to the grand jury in the same transaction. Each airline ticket cost $466.80. |
| Check issued for Concierge Room at Houston Marriott Marquis Hotel | 10/13/21 | The defendant, VINCENT J. PALERMO stayed at a luxury hotel suite during the September, 2021, Houston trip that cost LPOA $5,402.02 and this was his personal hotel room.  LPOA issued a check covering the cost of that luxury suite that the defendant caused to be deposited in his bank account on October 13, 2021.  VINCENT J. PALERMO failed to disclose this payment. |
| LPOA deposits City of Omaha Check from Turn Back Tax Committee | 3/10/22 | LPOA deposited $7,000 check following VINCENT J. PALERMO's participation in their Turn Back Tax Committee decision to act on LPOA's application for funds. |
| Call intercepted between JOHNNY PALERMO and RICHARD GONZALEZ | 9/22/22 | RG - I think you should tell everybody to start turning in receipts.<br>JP – Okay…I-I bring mine tomorrow<br>RG - The people that are gettin reimbursed are comin in to get their money<br>JP - Oh, okay<br>RG - Right away, but it's all the rooms that were on the LPOA card, so<br>JP - Okay, yeah<br>RG - So, so what I did right now- I called Marriott<br>JP - Mhm<br>RG - I was missin one of our receipts and I called em up and-and asked em, so but th-I-I got the receipts for me, [PACE employee], Vinny, [LPOA fundraiser]…those rooms are done<br>JP - Okay<br>RG - And then the airfare…the tickets that you bought for me, [LPOA fundraiser], and [PACE employee] can you get that receipt soon?<br>JP - Yep, yep. |

| | | |
|---|---|---|
| | | RG - Okay. I mean that-that's a good lil chunk of-a $5,000 I'm sure there and then you and [LPOA Board Member] and somebody else<br>JP - Yep<br>RG - Th-you bought three tickets for who else?<br>JP - Um me, [LPOA members]<br>RG - So that's six tickets right there<br>JP - Yep<br>RG - Okay, on-on the LPOA card, right?<br>JP - Yep |
| Call recorded between FBI Agent and VINCENT J. PALERMO | 10/14/22 | VP: This is Vinny.<br>SA: Hey, Mr. Palermo....I'm a Special Agent with the FBI.<br>VP: Okay…<br>SA: From what I understand, there are annual disclosure forms that are filed as far as what businesses that a public official's affiliated with and so forth…I understand you have a small business, right? You're Vinny's Tree Service…<br>VP: Correct.<br>SA: You own [it]….<br>VP: Yep.<br>SA: I've got a form called Statement of Financial Interests.<br>VP: Ok.<br>SA:…had a couple questions about an entity called…LPOA…<br>VP: Yeah.<br>SA: What sort of affiliation do you have with that entity?<br>VP: …My cousin Johnny Palermo, who's a detective with the Omaha Police Department is the president of LPOA.<br>SA: Does LPOA make payments to you?<br>VP: No.<br>SA: Have you ever received money from them?<br>VP: No. |
| Call intercepted between JOHNNY PALERMO and VINCENT J. PALERMO | 10/14/22 | VP: I got a call from the same people that were calling you the other day.<br>JP: Downtown guys?<br>VP: FBI guys, yeah…They want to know if PACE or LPOA pay me?...every year we have to file disclosure statements with the city. You have to |

6

| | | |
|---|---|---|
| | | account for every penny that goes one way or another.  The only thing I can think of is…the trips…these dirty rotten..they take a trip like last year to Houston and all of a sudden it's, you know oh my God.<br>JP:  Right, right…they're digging, digging. They probably got a whole file on us now.<br>VP: Oh 100%.  They're looking at you, me, [LPOA fundraiser], [PACE employee], Rich, [LPOA Board member], anybody that hangs out at the Lemon Drop, that's who they're looking at.<br>JP:  Well fuck.<br>VP:  If one little fucking trip has my name on it, and a ticket was paid by you, they're gonna say I should've claimed that.  You know.<br>JP:  Right.<br>VP:  But the only thing it would be is plane tickets? You know?<br>JP:  Yeah. Yeah.<br>VP:  Hotel rooms. Stuff like that.  I don't, you know, I don't think any of them was ever in my name.<br>JP:  Nah, nothing was in your name.<br>VP:  They dig and they dig.  You know better than anybody.<br>JP:  Yeah.<br>VP: You get one little name…to see what it unravels…they unravel everything to see where the fucking money's going. …as an elected official, for a trip, I am supposed to claim it.<br>JP: You didn't go as an elected official.  You just went as the homeboy.  You are my cousin.<br>VP:  Yep, exactly.<br>JP:  It made me look into the Jewish people, and how they operate.  They're like the mafia on top of the mafia….that's what we gotta be like, you know what I'm saying.<br>VP: They always have been…that's why district 66 is so tight…They take care of each other.  I'll call Richie here in a little bit. |
| Call intercepted between Vincent | 10/14/22 | VP - Yep. Yep. They're gonna say that I was, I was paid by LPOA, and look at all the money I've got |

| Palermo and Richard Gonzalez | | for them. And here's what I got for return. Free trips.<br>RG - Holy shit.<br>VP - That's their spin. That's the way they fucking work that madness.<br>RG - But you're an LPOA member too though, right?<br>VP - No. No. Unofficially.<br>RG - You're an associate member.<br>VP - Yeah associate member. I don't pay dues though.<br>RG - But you, you're probably gonna have to, you are, I mean you are an associate member. You'll probably have to say that at some point anyways…<br>VP - 100% dude. When he pulled my campaign disclosure file, which I know what that is…<br>Every fucking penny you get from somebody has to be on there. So, anyway….Which means they're, they're putting all their pieces of the puzzle together<br>RG - Mhm.Yep, these mother fuckers, bro.<br>VP - I know how this works… You guys better watch your shit<br>RG - Well, they, they seen you on the fucking, like you said, on a trip, people know that you went on a trip.<br>VP - They seen me on a trip…The only check I ever received was last year, otherwise I never turned in receipts for nothing…They're looking for the big ticket items and that $5,000 one is a big ticket item.<br>RG - Mhm<br>VP: …That's exactly what it is. I mean I know, but, like I said, it has to come from somewhere. And somebody fuckin ratted. And then when they start digging, then they start looking and that's, I mean that's what they found.<br>RG: They pulled your shit.<br>VP: …They found something. But here's the thing. Is anybody else getting any fucking calls? Like, like, has anybody else reached out to Johnny and said "hey the FBI reached out to me," and, you |

| | | |
|---|---|---|
| | | know, no. Cause there are fucking people that will turn us in<br>RG: Yeah.<br>VP: But I just wanna give you a heads up cause I mean if they're calling me, technically they should be calling others.<br>RG: Keep me posted.<br>VP: Yeah. I mean, fuck, I ain't sweat'en it.<br>VP: This is the fucking FBI…This is a brand new opening of another web of what's going on.<br>RG: Yeah and it's no coincidence that's when you just came back from a trip with the LPOA.<br>VP: Yep.<br>RG: You don't think those fucks all know that?<br>VP: I saw [UI] They must want me to put that in there too. 100%…<br>VP: The FBI investigates finance disclosure problems. So this, again, this probably all got opened up by something else that was started…. They're going through one by one and picking everybody a-fucking-part that's affiliated. This is no coincidence.<br>RG: Right, right.<br>VP: So. That's how, hey, that's how the fucking mafia gets taken down. By little fucking parts of their web all, you know, this way, that way…<br>VP: [LPOA fundraiser's] shit will never make the fucking newspaper. Me getting fucking a kickback? From a non-profit in the city of Omaha? Oh by the way, my cousin's the fucking president? Dude.<br>RG: Mmhmm. |
| Conversation intercepted between RICHARD GONZALEZ and JOHNNY PALERMO | 10/14/22 | JP - Man just watching this fucking power, like OPPD truck been sitting outside of my house for 6 hours. Mother fuckers watching me dog.<br>RG - (Laughter) No shit.<br>JP - These mother fuckers been out here 6 hours. Hold up. You talk to Vinny?<br>RG - Yeah! God…I'll tell you right now Johnny, if anybody comes to talk, to try to talk to you. Just say hey man… just say you will have to talk to my accountant, I don't know. |

| | | |
|---|---|---|
| | | JP - Ok.<br>RG - Right.<br>JP - Yeah.<br>RG - Like Vinny told them, I'm not talking to you…<br>JP - Mhm.<br>RG - There are going to try to spin this shit. Like Vinny was giving uh uh money to LPOA and in return he was getting free trips.<br>JP - Right, right. |
| Call intercepted between JOHNNY PALERMO and VINCENT PALERMO | 10/20/22 | JP: Well they're talking about kickbacks.<br>VP: Ah, see that's what they're talking to me. That's what they're talking to me about too.<br>JP: So [LPOA fundraiser] went and did an interview.<br>VP: Yeah.<br>JP: He thought it was about his taxes.<br>VP: Yeah.<br>JP: But they were like, no, we want to know if you ever paid like somebody like Johnny Palermo. Or anybody on the board, you know what I mean?<br>VP: Yeah dude…They're investigating everybody for kickbacks. Which means somebody fucking ratted.<br>JP: Yeah somebody's talking.<br>VP: ...But you know what? Here's the other thing too...you better fucking believe somebody's seen us out somewhere and they seen that LPOA card pay and... they correlate it as a kick back....so I wonder if they think [LPOA fundraiser] is part of a kick back crew. |
| Conversation intercepted between LPOA Board Member #1 | 10/27/22 | BM #1 - How much did we spend at this conference, legit?<br>JP - I think 15.<br>BM #1 - But, but who, who all went that wasn't even…that's not even LPOA besides Vinny?<br>JP – [LPOA fundraiser], and [PACE employee known to grand jury].<br>BM #1 - So, then he gettin kickbacks, that's what it's going to look like.<br>JP - Right |

| | | |
|---|---|---|
| | | BM #1 - Fuck man…why did we pay for him? <br> JP - I don't know, it was all Rich man, I don't know. I didn't even know he was going. <br> BM #1 - Fuck man, Jesus Christ, I guess I'd kinda quit asking questions, the less I know the better. <br> BM #1 - So who all, who else went that wasn't part of the group? Part of a legit group? <br> BM #1 – [PACE employee known to grand jury] <br> JP - mm-hmm <br> BM #1- Vinny? <br> JP - Yeah |
| Conversation intercepted between Witness #2 and VINCENT J. PALERMO | 11/2/22 | W-2: Well prepared to be pissed off at me. <br> VP: Ok <br> W-2: I got the knock knock on my door today and … I answered it like a dummy… And they came up to me and showed me their badges… <br> VP: Yeah <br> W-2: And I panicked man…Well they just, uh, mainly, uh, they showed me four copies of… checks from the City of Omaha made payable to LPOA and it said [Board Member #4]. …wanted to know, uh, if what I knew about your Turns Backs Committee… <br> VP: Ha, ha, ha <br> W-2: It has to be turned in if there were any gifts or luxurious trips given to a Council Member. <br> VP: Oh. <br> VP: I know what they are after, they're after the trips I took as a member of LPOA. <br> W-2: As a member not as a City.. <br> VP: As a member. I went as a member. <br> W-2: Ok <br> VP: And that money that was awarded to them, uh, they're free to use it as they want. If they're saying that I gave them City money and then in return that City money was used for me to go on a trip, no it was used for members to go on a trip. <br> W-2: …Which…I'm not giving them any information besides yes, no, or I don't know… <br> VP: …And you should have said that was before me. |

| Conversation intercepted between VINCENT J. PALERMO and Witness #3 | 12/15/22 | VP: I got questions about why I pick the same people for fucking firework permits.<br>W-3: Seriously<br>VP: Like there's some uh kickback or bribe going on, it's like…there should be<br>W-3: (laughing) yeah<br>VP: There should be but there's fucking not.<br>W-3: Vinny, I'm learning this shit. And, so, I met with [non-profit known to grand jury]s guys last night. We went to fucking the Drover.<br>VP: uh huh<br>W-3: …you fucking give them the firework permit and you're a fucking rockstar<br>VP: Yeah…for me, my picks have been the same for five fucking years…<br>W-3: You know what, Vinny, this thing was like drinking out of fire hose for me... But now that I've been through it once, and now listening to you, you're right,[Fireworks Vendor #1] needs to go get some fucking hookers and coke or whatever for [non-profit known to grand jury] dude<br>VP: Yeah it's not the council members. It's your fucking non-profits that have to go with you.<br>…Because I'm going with them whoever they pick. I think my non-profits are going with [Fireworks Vendor #2]. All of them. Because [Fireworks Vendor #2] is probably smart enough to say, hey this fucking Palermo is picking you three every year. I'll give you whatever you want. I want them three permits. That's how it's suppose to be.<br>W-3: Yup yup yup…. I'm not going to invest any time. You know who I'm picking.<br>VP: Yup yup<br>VP: … I mean, it's simple fucking business. And what I've heard is [fireworks vendor known to the grand jury] don't like to pay as much as the others. You know that's what Rich's biggest gripe with him was. He was being fucking cheap with these non-profits. You know. He was giving them 5 grand and [Fireworks Vendor #2] comes in and said I'll give you ten. Well, who the fuck you going to go with. Cuz all they do is write them a check and walk away. And they were like, no, [Fireworks |

| | | Vendor #1] don't want to raise his prices, he's being cheap. We're not going with him. [Fireworks Vendor #1]could have every one of them fucking tents if he would just pony up.<br>W-3: Alright, very good to know.<br>VP: So<br>W-3: Alright, good shit man. |

### III
### PENALTIES

A.     COUNT I.  Defendant understands that the crime to which defendant is pleading guilty carries the following penalties:

1.     A maximum twenty (20) years in prison;

2.     A maximum 250,000 fine;

3.     A mandatory special assessment of $100 per count; and

4.     A term of supervised release of not more than three (3) years.  Defendant understands that failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring defendant to serve in prison all or part of the term of supervised release.

5.     Possible ineligibility for certain Federal benefits.

### IV
### AGREEMENT LIMITED TO U.S. ATTORNEY'S OFFICE
### DISTRICT OF NEBRASKA

This plea agreement is limited to the United States Attorney's Office for the District of Nebraska, and cannot bind any other federal, state or local prosecuting, administrative, or regulatory authorities.

### V
### SENTENCING ISSUES

A. SENTENCING AGREEMENTS

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the parties agree the defendant shall receive a sentence not to exceed twenty-one (21) months.

13

Each party reserves the right to put forward evidence at time of sentencing regarding whether the loss amounts for any counts outside of Count I should be treated as relevant conduct in this manner.

The Court shall determine the appropriate restitution in this mater, and the amount of restitution ordered by the Court shall include all relevant conduct, including, but not limited to, all charged and uncharged criminal conduct alleged in the Indictment, and not limited to the count(s) of conviction.  The parties specifically making the following restitution agreements:

Defendant further agrees to the following regarding Restitution:

a.  The amount of restitution ordered by the Court shall include all relevant conduct, including, but not limited to, all charged and uncharged criminal conduct alleged in the Indictment, and not limited to the count(s) of conviction.

b.  Defendant also shall pay the Special Assessment of $100 per count of conviction by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case.

c.  Restitution and Assessment payments shall be made payable to the "U.S. District Court Clerk. "

d.  The parties agree that restitution amounts and amounts disbursed to any victims will be determined at sentencing by the District Court and that the defendant will abide by the District Court's order.

e.  Court imposed monetary penalties are due immediately and subject to immediate enforcement by the United States. 18 U.S.C. § 3613.

f.  Any Court ordered schedule for restitution payments is merely a minimum  payment obligation, and does not limit the methods by which the United States may immediately enforce the judgment in full, including but not limited to enrollment in the Treasury Offset Program (TOP) (see 26 U.S.C. § 6402(d); 31 U.S.C. §3720A; 31 U.S.C. § 3716) and garnishment of available funds, wages, or assets (see 18 U.S.C. §§3613, 3664(m)).

g.  If incarcerated, Defendant will participate in the Bureau of Prisons Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a payment schedule.

14

h. Defendant will provide all of defendant's financial information to the United States and the Probation Officer, and agrees, if requested, to participate in a pre-sentencing debtor exam. Defendant will fully and truthfully disclose all assets and property in which Defendant has any interest, or over which Defendant exercises control directly or indirectly, including assets and property held by a spouse, nominee or other third party.

i. At the request of the U.S. Attorney's Office (USAO), Financial Litigation Program (FLP), Defendant will promptly execute and return a fully completed and executed Financial Disclosure statement under oath, a Tax Information Authorization Form 8821, and a Request for Transcript of Tax Return Form 4506-T. Defendant also agrees to provide the USAO FLP copies of financial information that Defendant submitted to the U.S. Probation Office.

j. Defendant authorizes the USAO FLP to obtain Credit Reports concerning Defendant to enable the USAO to evaluate Defendant's ability to satisfy any financial obligations and monetary penalties imposed as part of the sentence, and will execute any Release for such information upon request.

k. Defendant understands that compliance with USAO requests for financial information will be taken into account when the United States makes a recommendation to the Court regarding Defendant's acceptance of responsibility at sentencing. Defendant's failure to timely and accurately complete and sign the financial statement and any update thereto, may, in addition to any other penalty or remedy, indicate a failure to accept responsibility.

l. Defendant's disclosure obligations are ongoing, and are in force from the execution of this agreement until Defendant has satisfied restitution in full.

m. Defendant certifies that Defendant has not transferred assets or property for the purpose of (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; nor (3) hindering efforts of the USAO to enforce such financial obligations. Defendant promises that Defendant will make no such transfers in the future.

n. If the United States learns of any misrepresentation in the financial disclosure statement, or of any asset in which Defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such

15

misrepresentation or nondisclosure changes the estimated net worth of Defendant by ten thousand dollars ($10,000.00) or more, the United States may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, enforce the full forfeiture, restitution, and fines imposed by any criminal or civil judgment, including enforcement of 100 percent of the value of any previously undisclosed asset. Defendant agrees not to contest enforcement against of such asset or property. If the United States opts to be relieved of its obligations under this plea agreement, Defendant's previously entered pleas of guilty shall remain in effect and cannot be withdrawn.

B.  ADJUSTMENTS, DEPARTURES & REDUCTIONS UNDER 18 U.S.C. § 3553.

The parties agree that defendant may request or recommend additional downward adjustments, departures, including criminal history departures under U.S.S.G. § 4A1.3, and sentence reductions under 18 U.S.C. § 3553(a), and that the United States will oppose any such downward adjustments, departures, and sentence reductions not set forth in Section V, paragraph A above.

C.  "FACTUAL BASIS" AND "RELEVANT CONDUCT" INFORMATION.

The parties agree that the facts in the "factual basis" paragraph of this agreement, if any, are true, and may be considered as "relevant conduct" under U.S.S.G. § 1B1.3 and as the nature and circumstances of the offense under 18 U.S.C. § 3553(a)(1).

The parties agree that all information known by the office of United States Pretrial Service may be used by the Probation Office in submitting its presentence report and may be disclosed to the court for purposes of sentencing.

## VI
## DEFENDANT WAIVES APPEAL AND COLLATERAL ATTACK

The defendant hereby knowingly and expressly waives any and all rights to appeal the defendant's conviction and sentence, including any restitution order in this case, and including a waiver of all motions, defenses, and objections which the defendant could assert to the charges or to the Court's entry of Judgment against the defendant, and including review pursuant to 18 U.S.C. § 3742 of any sentence imposed, except:

(a) As provided in Section I above, (if this is a conditional guilty plea); and

16

4:23-cr-03052-JMG-CRZ   Doc # 117   Filed: 08/18/23   Page 17 of 20 - Page ID # 856

(b) A claim of ineffective assistance of counsel.

(c) A right to file a motion under Section 3582(c)(1)(A);

    1. the general right to file a compassionate release motion;

    2. the right to file a second or successive such motion; or

    3. the right to appeal the denial of a compassionate release.

The defendant further knowingly and expressly waives any and all rights to contest the defendant's conviction and sentence in any post-conviction proceedings, including any proceedings under 28 U.S.C. § 2255, except:

(a) The right to timely challenge the defendant's conviction and the sentence of the Court should the Eighth Circuit Court of Appeals or the United States Supreme Court later find that the charge to which the defendant is agreeing to plead guilty fails to state a crime.

(b) The right to seek post-conviction relief based on ineffective assistance of counsel.

If defendant breaches this plea agreement, at any time, in any way, including, but not limited to, appealing or collaterally attacking the conviction or sentence, the United States may prosecute defendant for any counts, including those with mandatory minimum sentences, dismissed or not charged pursuant to this plea agreement. Additionally, the United States may use any factual admissions made by defendant pursuant to this plea agreement in any such prosecution.

## VII
## **BREACH OF AGREEMENT**

Should it be concluded by the United States that the defendant has committed a crime subsequent to signing the plea agreement, or otherwise violated this plea agreement, the defendant shall then be subject to prosecution for any federal, state, or local crime(s) which this agreement otherwise anticipated would be dismissed or not prosecuted. Any such prosecution(s) may be premised upon any information, statement, or testimony provided by the defendant.

In the event the defendant commits a crime or otherwise violates any term or condition of this plea agreement, the defendant shall not, because of such violation of this agreement, be allowed to withdraw the defendant's plea of guilty, and the United States will be relieved of any

17

obligation it otherwise has under this agreement and may withdraw any motions for dismissal of charges or for sentence relief it had already filed.

## VIII

## SCOPE OF AGREEMENT

A.  This plea agreement embodies the entire agreement between the parties and supersedes any other agreement, written or oral.

B.  By signing this agreement, the defendant agrees that the time between the date the defendant signs the agreement and the date of the guilty plea will be excluded under the Speedy Trial Act.  The defendant stipulates that such period of delay is necessary in order for the defendant to have opportunity to enter the anticipated plea of guilty, and that the ends of justice served by such period of delay outweigh the best interest of the defendant and the public in a speedy trial.

C.  The United States may use against the defendant any disclosure(s) the defendant has made pursuant to this agreement in any civil proceeding.  Nothing contained in this agreement shall in any manner limit the defendant's civil liability which may otherwise be found to exist, or in any manner limit or prevent the United States from pursuing any applicable civil remedy, including but not limited to remedies regarding asset forfeiture and/or taxation.

D.  Pursuant to 18 U.S.C. § 3013, the defendant will pay to the Clerk of the District Court the mandatory special assessment of $100 for each felony count to which the defendant pleads guilty.  The defendant will make this payment at or before the time of sentencing.

E.  By signing this agreement, the defendant waives the right to withdraw the defendant's plea of guilty pursuant to Federal Rule of Criminal Procedure 11(d).  The defendant may only withdraw the guilty plea in the event the court rejects the plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(5).  Furthermore, defendant understands that if the court rejects the plea agreement, whether or not defendant withdraws the guilty plea, the United States is relieved of any obligation it had under the agreement and defendant shall be subject to prosecution for any federal, state, or local crime(s) which this agreement otherwise anticipated would be dismissed or not prosecuted.

## IX

## MODIFICATION OF AGREEMENT MUST BE IN WRITING

No promises, agreements or conditions have been entered into other than those set forth in this agreement, and none will be entered into unless in writing and signed by all parties.

**X**

**DEFENDANT AND COUNSEL FULLY UNDERSTAND AGREEMENT**

By signing this agreement, defendant certifies that defendant read it (or that it has been read to defendant in defendant's native language).  Defendant has discussed the terms of this agreement with defense counsel and fully understands its meaning and effect.

UNITED STATES OF AMERICA
SUSAN T. LEHR
Acting United States Attorney

_____         _____
8/18/23
Date                                            LESLEY A. WOODS
                                                ASSISTANT U.S. ATTORNEY


_____         _____
8-18-23
Date                                            VINCENT J. PALERMO
                                                DEFENDANT


_____         _____
8-18-23
Date                                            RANDALL PARAGAS
                                                COUNSEL FOR DEFENDANT

20